**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| SANTOS ROSALES-MARTINEZ,<br><br>               Petitioner,<br><br>vs.<br><br>NICK LUDWICK, Warden of the Iowa State Penitentiary,<br><br>               Respondent. | No. C13-4044-LTS<br><br>**REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254** |

---

## I.    INTRODUCTION

This matter is before the court for a decision on the merits of petition for writ of habeas corpus filed by a state prisoner who claims the State of Iowa violated his constitutional rights. Petitioner, Santos Rosales-Martinez, was convicted in 2002 of sexually abusing his wife's minor daughter. Upon review of the record, and having considered the arguments made by the parties in their pleadings, I recommend the district court deny the petition for the reasons set forth below.

## II.    PROCEDURAL HISTORY OF THIS FEDERAL CASE

On May 13, 2013, petitioner Santos Rosales-Martinez, an inmate at the Iowa State Penitentiary, filed a pro se petition in the United States District Court for the Southern District of Iowa seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doc. 1. The case was transferred to the Northern District of Iowa because his conviction occurred in this district. Doc. 2. On January 27, 2014, respondent filed a motion to dismiss the petition. Doc. 12. Petitioner resisted the motion. Doc. 15. On April 30, 2014, the court held a hearing on the motion to dismiss, during which the court granted petitioner

leave to file a second amended complaint, reserving ruling on the motion. Doc. 30. On June 30, 2014, petitioner filed a second amended complaint. Doc. 24. Respondent filed a renewed motion to dismiss the second amended complaint. Doc. 25. On September 9, 2014, the court issued an order denying the motion to dismiss, but indicated it would hold an evidentiary hearing "to determine whether [petitioner] has demonstrated extraordinary circumstances such that equitable tolling" of the statute of limitations would excuse an otherwise late filing of the petition. Doc. 30, at 16. The court also ordered the parties to "brief the merits" of the petition and be prepared to "argue the merits" of the petition at the anticipated evidentiary hearing. *Id*.

The parties have since filed briefs on the merits of the petition. Petitioner seeks "an evidentiary hearing to present further evidence and argument on these issues." Doc. 39, at 20. Respondent resists an evidentiary hearing on the merits, arguing that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) does not permit the admission of new evidence in most habeas proceedings, that petitioner has not identified any new evidence that would require an evidentiary hearing, and that the court can rule on the merits of the petition without an evidentiary hearing. Doc. 42, at 35-38. Respondent further argues that, although it maintains that the statute of limitations bars the petition, in the interests of judicial economy, the court should deny the petition on the merits and forego the planned evidentiary hearing on the statute of limitations issue. Doc. 42, at 38.

The court concludes that an evidentiary hearing is unnecessary and inappropriate to reach the merits of the petition in this case. Title 28, United States Code, Section 2254(e)(2), generally bars evidentiary hearings in federal habeas proceedings. There is an exception where a petitioner makes a credible showing of actual innocence based on new evidence. *McQuiggin v. Perkins*, --- U.S. ----, 133 S. Ct. 1924, 1933 (2013). As

explained in more detail below, however, I find petitioner has not made a credible showing that there is, in fact, new evidence of actual innocence. Moreover, because I conclude the petition should be denied on its merits, respondent's motion to dismiss on statute of limitations grounds is moot, rendering an evidentiary hearing on that motion unnecessary. Finally, I conclude that oral arguments on the merits of the petition are unnecessary as the parties' briefs were thorough and well argued.

## III.   FACTUAL AND PROCEDURAL HISTORY OF THE STATE CASE

The Iowa Court of Appeals previously summarized the relevant facts of the underlying criminal conduct in this case, which this court finds accurate upon its own review of the record.

> Mary Castillo met Santos Rosales-Martinez while living in California with her young daughter A.C. Castillo and Rosales-Martinez married in 1997 and moved to Storm Lake, Iowa, in June of 1999. There, Rosales-Martinez began working night shifts at the IBP plant. The family first lived in a motel room and then a two-bedroom apartment. All three shared one bedroom; the other bedroom was occupied by one of two of Rosales-Martinez's friends, Ruben ("Nacho") or Moses Vargas. Castillo stayed home with seven-year-old A.C. until August when A.C. started school. In September, Castillo began working at a hospital. Twice Castillo worked weekends, during which Rosales-Martinez cared for A.C.

> On January 28, 2000, Iowa Department of Human Services (DHS) social worker Susan Garvin began a child abuse assessment concerning A.C. and allegations of sexual abuse. A no-contact order was entered prohibiting Rosales-Martinez from having contact with A.C. or Castillo. Garvin directed Castillo to move with A.C. out of the apartment.

> Garvin first interviewed A.C. on January 31, 2000. A.C. told her about having "secrets" with Rosales-Martinez and that she was not supposed to tell about the "touching." Using an anatomical drawing, A.C. indicated

that Rosales-Martinez had touched her vaginal area and buttocks with a finger.

On February 3, 2000, Castillo and Garvin drove A.C. to the child advocacy center in Sioux City for a physical examination. Ms. Garvin heard Castillo whispering to A.C. in the car and told Castillo to speak out loud and that there should be no more secrets. Dr. M.J. Jung examined A.C. and found no physical evidence of sexual abuse. A.C. was interviewed by a child protection worker while in Sioux City. Garvin observed the interview, during which seven-year-old A.C. made no statements about sexual abuse.

DHS removed A.C. from Castillo's custody that same month and placed her with a foster family.

Ms. Garvin interviewed A.C. a second time a year later, on February 27, 2001. Police Officer Chris Cole was present and took notes. A.C. told Garvin that Rosales-Martinez put his mouth on her private part and he put his private part in her mouth.

*Rosales-Martinez v. State*, 2011 WL 6740152, at *1 (Iowa Ct. App. Dec. 21, 2011).

On March 19, 2001, the State of Iowa charged petitioner with second-degree sexual abuse. App. 1.[1] Prior to trial, the State moved for a protective order concerning measures it believed necessary to protect the minor victim during her deposition. App. 3-5. In particular, the State requested that the victim be able to testify from behind a one-way mirror and that she not be told that petitioner could see her. On June 11, 2001, the court held an evidentiary hearing on the motion. App. 10-54. Karen Gotto, a counselor who worked with the victim, testified about the victim's fear of petitioner. She testified that the victim was afraid of petitioner, and that, in the context of a deposition,

---

[1] "App." Refers to the appendix in petitioner's direct appeal, while "PCR App." refers to the appendix in his state post-conviction relief case. Both are part of the record in this case at Doc. 34.

her fear of him would impact her testimony.  *See, e.g.*, App. 1820, -21, 26-27, 33-35.
In pertinent part, she testified as follows:

> Q.  You mentioned two occasions where you believe there may have been contact [with petitioner].  What kind of reaction did she [the victim] show at those times?
>
> A.  At the parade she showed extreme fear.  Basically signs of terror is what was described to me.  I was not there to see it.
>
> Q.  You were not present?
>
> A.  Her foster mom was present, and her and [the victim] reported signs of terror, very scared and clingy to the foster mom, not wanting to leave her side.  She had difficulty talking until they got to a safe place.
>
> * * *
>
> Q.  In your professional opinion, can you as the therapist that's involved here give us any idea of what effect it would have upon A.C. [the victim] hearing that [petitioner] could see and hear her?
>
> A.  I think it would be very traumatizing for her.  I think she would probably have the same reaction she does when she describes the abuse that occurs. . .  I feel that any chance of contact with him or even being in the same building with her would be extremely traumatic for her.

App. 20-21.

> Q.  As you look back on those times when [the victim] told you about the fear that she had coming into contact with [petitioner], do you have a doubt from your education and your experience as a social worker and the many times talking to [the victim] that she was feeling terror or fearful of him?

5

A.      I believe she was telling the truth.

App. 33.

The victim's foster mother, Kay Andrews, also testified that the victim was fearful of petitioner. *See*, *e.g.*, 38-40, 43. Regarding the incident at the parade where the victim saw petitioner, her foster mother testified about the victim's reaction:

> She's just—Her face—She was scared spitless is all I can say. Her eyes were wide open. She was crying, but she was not making any sound. . . . I would say the color just sort of drained out of her face. She wasn't making any noise, but her mouth was wide open, and her eyes were wide open and tears were streaming down her face . . . .

App. 38-39. She also testified about the impact it would have on the victim knowing that petitioner would be present during her deposition.

> Q.      Part of the concern with her knowing that [petitioner] is present during is that she will shut down or alter her story or not tell the full story. Based upon your experiences with her, do you think that's a possibility?
>
> A.      I guess I do think so because she lived with us a year and maybe another month, you know, where day after day we're telling her she is safe. . . . And it still took her a year before she brought up more information to me.

App. 43.

On July 6, 2001, the trial court granted the State's motion for a protective order. Based on the record at the June 11, 2001, hearing, the trial court found that the victim "would suffer serious trauma caused by testifying in the physical presence of [petitioner] and that it would impair [the victim's] ability to communicate . . . ." App. 56. Accordingly, the court approved having the victim testify behind a one-way mirror and not telling the victim that petitioner was present and could see her testify. App. 57.

The case came on for trial in October 2001. Prior to trial, the State renewed its motion for a protective order, requesting that the victim be permitted to testify by way of closed-circuit television, relying on the record established at the hearing on June 11, 2001. Petitioner did not object. PCR App. 11-12. The court, therefore, approved having the victim testify by closed-circuit television. PCR App. 106-107. The trial commenced on October 30, 2001, but ended in a mistrial due to a hung jury. App. 65-66.

Trial was rescheduled for January 2002. Prior to the retrial, petitioner moved in limine to bar the State from eliciting testimony from Dr. M. J. Jung that the fact he did not find physical evidence of sexual abuse when he examined the victim did "not mean there was not a sex act perpetrated on the victim," and that such a finding is not uncommon in sex abuse victims. App. 79. The court granted the motion in limine because the State had not included that proposed evidence in its minutes of testimony for this witness, and it was not in his report. The court therefore ordered that:

> Dr. M. J. Jung shall not be permitted to testify beyond the findings contained in his written report dated February 3, 2000. More specifically, the State is prohibited from offering evidence from Dr. Jung to the effect that the negative report is not uncommon in a case such as this.

App. 80.

The retrial commenced on January 8, 2002, and ended with a guilty verdict on January 11, 2002.

Prior to the victim testifying, the court held a hearing, outside the presence of the jury, regarding the State's request to have her testify by closed-circuit television. App. 146-51. The State relied on the record made during the June 11, 2001, evidentiary hearing, arguing it established that the victim would suffer anxiety and trauma were she required to testify in front of Petitioner. Petitioner resisted the State's request, but indicated that he understood the court's ruling on July 6, 2001. The court granted the

State's request to have the victim testify by closed-circuit television finding, "it is necessary to protect the minor child [victim's name] from trauma caused by testifying in the physical presence of the defendant in open court." App. 151.

At the second trial, police officer Chris Cole testified about his investigation of the crime. The prosecutor questioned Cole about his efforts to question petitioner. The following exchange took place.

> A.    I—I made arrangements or tried to get ahold of him at work. I was unable to locate him at work either. So I left a message with his employer to have him give me a call, because I needed to talk to him about something.
>
> Q.    Were you ever contacted?
>
> A.    No, I was not.
>
> Q.    Did anyone contact you on his behalf?
>
> A.    I was contacted by an attorney that said he was representing [petitioner]. . . . [The attorney] told me that [petitioner] wasn't going to speak with me.

App. 89. Petitioner's counsel did not object to this line of questioning. Later in his testimony, Officer Cole made more statements about trying to question petitioner after Cole arrested him.

> Q.    So once this warrant went out, what happened?
>
> A.    The warrant was issued, and a few days later he returned back to Storm Lake, and I arrested him on the arrest warrant.
>
> Q.    What did you do with him then?
>
> A.    I tried to interview him in regards to the allegations?
>
> Q.    Where was that?

A.     At the Buena Vista County Sheriff's Office.

Q.     Was that a long interview?

A.     No.

Q.     What did you learn in that interview, if anything?

A.     Pretty much nothing. I learned that he didn't want to speak with me.

Q.     How did you learn that?

A.     He told me.

Q.     So did he request an attorney at that time?

A.     Yes.

Q.     In fairness, did he also deny the charges?

A.     Correct.

App. 97-98. Petitioner's counsel did not object to this line of questioning.

The State considered calling a medical doctor, Dr. David Archer, to testify. Prior to the State calling this witness, petitioner's counsel asked the court to bar Dr. Archer from testifying that the absence of physical evidence from the victim showing sexual abuse does not mean she was not sexually abused. App. 243-59. The court granted petitioner's request and barred this testimony, finding it was the same type of testimony from Dr. Jung that the court previously barred in the order granting petitioner's motion in limine. App. 256-59. The State did not end up calling Dr. Archer to testify.

The State did have a child protection officer testify. At one point during her testimony, the prosecutor asked her about Dr. Jung's physical examination of the victim.

Q.     Point in fact, you have no physical evidence, physical evidence of sexual abuse upon [the victim], isn't that true?

A.     The result of the exam was that there were no physical findings, that's correct.

* * *

Q.    Were you surprised by that?

A.    Not at all.

Q.    Why?

App. 260, 262.  Petitioner's counsel objected at this point.  Outside the presence of the jury, the court heard argument about the objection, and the court sustained the objection, not allowing the witness to answer the question, concluding that the subject matter of the testimony was within the scope of the court's ruling on the motion in limine regarding Dr. Jung's anticipated testimony.  App. 262-78.  The court denied petitioner's motion for a mistrial.  App. 279.  When trial recommenced, the court told the jury to disregard the question "Were you surprised by that" and the witness's answer.  App. 281.

The victim's mother also testified against petitioner.  On February 8, 2002, petitioner filed a motion for a new trial claiming newly discovered evidence based on the victim's mother allegedly recanting her testimony.  App. 286-301.  The court denied the motion after an evidentiary hearing during which the mother and other witnesses testified.  App. 480-86.  The court found that "[e]ach statement made by [the mother] was refuted by a witness or witnesses on behalf of the State" (App. 483), and "[t]he credibility of [the mother] is seriously questioned by the Court" (App. 485).  The court found that there was evidence in the file showing that the mother had previously denied that petitioner sexually abused her child and concluded "[t]he alleged newly discovered evidence the [petitioner] relies on to support his motion for a new trial is not newly discovered evidence," but, rather, was "well-known to the [petitioner] prior to the trial of the case."  App. 485.

Petitioner appealed his conviction alleging: (1) the court erred when it overruled his motions for a mistrial based on alleged prosecutorial misconduct; (2) the trial court

erred when it approved the protective order permitting the victim to testify by closed-circuit television, or, alternatively, that his counsel was ineffective for failing to object to the procedure; (3) his trial counsel was ineffective for failing to object to questions infringing upon his right to remain silent; and (4) the court erred in denying his motion for a new trial based on alleged newly discovered evidence. *State v. Rosales-Martinez*, 2003 WL 21229134, at *1-5 (Iowa Ct. App. May 29, 2003). The Iowa Court of Appeals affirmed the conviction but preserved petitioner's Sixth Amendment confrontation claims for possible post-conviction review. *Id.*, at *5. Petitioner's state post-conviction petition was denied on all grounds. PCR App. 494-508. The Iowa Court of Appeals denied his appeal of this ruling. Doc. 33 (attachments 9 & 10); *Rosaeles-Martinez*, 2011 WL 6740152.

## IV.  STANDARDS FOR SECTION 2254 HABEAS CORPUS RELIEF

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, --- U.S. ----, 131 S. Ct. 770, 780 (2011). A federal court will not grant a petition for writ of habeas corpus "unless it appears that (1) the applicant has exhausted the remedies available in the courts of the State [the exhaustion doctrine], (2) there is an absence of available State corrective process; or (3) circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(A)-(B). *See also Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (holding that under the AEDPA, a petitioner must exhaust available state remedies). "Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, a state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842

(1999). The exhaustion doctrine "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *Boerckel*, 526 U.S. at 845

In Iowa, a prisoner must seek review through the "ordinary and established appellate review process" which includes an application for further review in the Iowa Supreme Court. *Welch v. Lund*, 616 F.3d 756, 758–59 (8th Cir. 2010) (internal citation omitted) (holding that an Iowa prisoner failed to exhaust his claims in the Iowa state courts when prisoner's appeal of the state district court's decision to the Iowa Supreme Court was "deflected to the Iowa Court of Appeals" and the prisoner failed to file for further review in Iowa Supreme Court).

Even when a prisoner's claim has been fully adjudicated in state court, a federal court still may not grant habeas relief unless the state court adjudication:

> (1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court; or

> (2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Woods v. Etherton*, 136 S. Ct. 1149 (2016) (*per curium*) (quotations and citations omitted). *See also Nash v. Russell*, 807 F.3d 892, 896 (8th Cir. 2015) (holding that under the AEDPA, a federal court can grant habeas relief only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.") (quotation and citation omitted).

"Contrary to . . . clearly established Federal law" as referenced in §2254(d)(1) means that the "state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result" opposite to that reached by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and writing for the majority). Circuit "precedent does not constitute 'clearly established Federal law' . . . ." *Parker v. Matthews*, --- U.S. ----, 132 S. Ct. 2148, 2155 (2012). Federal courts must be deferential in determining if the state court decision was based on "an unreasonable determination of the facts" as described in §2254(d)(2). "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The burden is on the petitioner, and it is a heavy one. "The AEDPA standard is difficult to meet as it is intended 'as a "guard against extreme malfunction in the state criminal justice system," not a substitute for ordinary error correction through appeal.'" *Nash*, 807 F.3d at 397 (quoting *Harrington*, 562 U.S. at 102-03, and *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

## V.    DISCUSSION

Petitioner argues he is entitled to relief on four grounds: (1) a violation of his Sixth Amendment right to confrontation when the court allowed the child victim to testify by closed-circuit television; (2) prosecutorial misconduct; (3) ineffective assistance of counsel; and (4) actual innocence. The court will address each ground in turn.

## A.    Ground One—Sixth Amendment Violation

Petitioner argues that the State violated his right to confront witnesses, as guaranteed by the Sixth Amendment to the United States Constitution, when it allowed the child victim to testify at trial by closed-circuit television.  Doc. 39, at 8-12.  Petitioner argues "there was no showing that A.C. would be so traumatized by the presence of the Petitioner as to necessitate closed-circuit testimony" and "no showing that the Petitioner's presence would impair A.C.'s ability to communicate."  Doc. 39, at 10.  Petitioner is mistaken.  The record does show evidence the victim would have been traumatized by being in the presence of petitioner and that it would have impaired her testimony.  Accordingly, I do not find that the State court unreasonably applied clearly established United States Supreme Court precedent or reached an unreasonable determination of the facts.

### 1. Did the Court Violate Petitioner's Sixth Amendment Rights?

The Confrontation Clause of the Sixth Amendment, applicable to the states through the Fourteenth Amendment, provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him."  The right to confront witnesses is generally understood to mean a "face to face meeting [between the defendant and] witnesses appearing before the trier of fact."  *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988).  *See also Maryland v. Craig*, 497 U.S. 836, 845 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before a trier of fact.").  It is "[t]he combined effect of these elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—[that] serves the purpose of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous

adversarial testing that is the norm of Anglo-American criminal proceedings." *Craig*, 497 U.S. at 846.

The right to confront witnesses, however, is "not absolute, and may give way to other important interests." *Coy*, 487 U.S. at 1020. *See also Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) (stating that face-to-face confrontation is not the *sine qua non* of the Confrontation Clause). Rather, courts have long recognized that face-to-face confrontation is a preference that "must occasionally give way to considerations of public policy and the necessities of the case." *Mattox v. United States*, 156 U.S. 237, 243 (1895). "[T]he protection of minor victims of sex crimes from further trauma and embarrassment" is one such compelling public policy. *Globe Newspaper Co. v. Superior Court of Norfolk County*, 457 U.S. 596, 607 (1982). In other words, the government's "interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to confront his or her accusers in court." *Craig*, 497 U.S. at 853.

Whether in a given case the government's interest in protecting the well-being of a minor sex abuse victim outweighs a defendant's confrontation rights is determined on a case-by-case basis through a three-part test. The court must: (1) "hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify"; (2) "find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant"; and (3) "find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimums*, *i.e.*, more than 'mere nervousness or excitement or some reluctance to testify'." *Craig*, 497 U.S. at 856 (quotation and citation omitted). "In sum, . . . where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant,

at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit the use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation." *Id.*, at 857.

The question before this court, on habeas review, is whether the State court's decision allowing the child victim to testify by closed-circuit television was contrary to this Supreme Court precedent or was based on an unreasonable determination of the facts in light of the evidence. The State court's decision was neither contrary to Supreme Court precedent, nor was it based on an unreasonable determination of the facts. As related above, the court heard testimony from a social worker and the child victim's foster mother that the victim was afraid of petitioner, that she was scared "spitless" on one occasion when she was in his presence, that she was in terror of petitioner, and that that fear would impair her ability to testify even in the context of a deposition where he could view her through a one-way mirror. The court reasonably relied on this record to determine the victim would have the same fear of petitioner when she testified at trial. Nothing in the record suggests that the victim's fear arose from the prospect of testifying in the courtroom, or in front of a jury, or in response to being questioned by lawyers. Rather, the record aptly supports the conclusion that her real and significant fear was of petitioner personally, regardless of the setting in which she would encounter him.

Petitioner argues that this case is similar to the facts of *United States v. Turning Bear*, 357 F.3d 730 (8th Cir. 2004). To the contrary, the facts of this case contrast starkly from those in *Turning Bear*. In *Turning Bear*, the child victim explained that the reason she cried and exhibited distress at the beginning of her courtroom testimony was because she "was scared to talk in front of them people [referring to the jury]." *Turning*

*Bear*, 357 F.3d at 735.  When asked by the court if there was anyone else she was afraid of, the victim identified the prosecuting attorney.  *Id*.  Only in response to leading questions from the prosecutor did the victim also indicate she was frightened by the presence of her father, the defendant, in the courtroom.  *Id*.  Based on these responses, the trial judge found the victim was afraid of the "combination" of being afraid of the courtroom setting, the jury, the prosecutor, and her attacker, and accordingly permitted her to testify by closed-circuit television.  *Id*.  Moreover, in *Turning Bear*, the evidence showed that the victim "had successfully testified on the previous day during a motion hearing outside the presence of the jury when her father was present" and testified that the "people in the jury scare [her] more than [her] dad being in the courtroom."  357 F.3d at 737.  None of those facts are present here.  There is no evidence in the record to suggest the victim's fear in this case arose from the jury, the prosecutor, or the courtroom setting, nor was there evidence that she had testified previously in her father's presence. Indeed, the evidentiary record regarding the victim's fear was generated in the context of her testifying in a deposition behind a one-way mirror and had nothing to do with her testifying before a jury or in a courtroom.

Therefore, I conclude that the court did not violate petitioner's right to confront his accuser because there was an adequate showing that the victim would be traumatized by testifying with petitioner present and that it would have adversely affected her testimony.

### 2.  *Was Any Sixth Amendment Violation Harmless?*

Even if the State court erred in permitting the victim to testify by closed-circuit television, petitioner is still not entitled to relief if the error was harmless.  Petitioner is not entitled to relief if the "guilty verdict actually rendered in *this* trial was surely

unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). In making this assessment, the court cannot consider the victim's closed-circuit television testimony. *See Coy*, 487 U.S. at 1021-22 ("An assessment of harmless error cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence."). The parties' briefs are of no help to the court in making this determination. Petitioner boldly claims that, absent the victim's testimony, the remaining evidence was "'scant' at best." Doc. 39, at 12. Respondent equally boldly proclaims that "[e]ven without considering the victim's testimony, sufficient evidence existed in the record to support the verdict . . . ." Doc. 42, at 22. Neither party, though, cited the record or summarized the remaining evidence to support these assertions. As result of my own review of the evidence, I conclude neither party's description is fully accurate.

At trial, law enforcement officer Chris Cole testified that a social worker reported that the victim had been sexually abused. App., at 87. He then testified about his investigation, including the fact that the victim was interviewed and that petitioner's wife made statements, but did not testify to the substance of any statements they made. App. 88-96. Office Cole also testified about the two attempts to question petitioner outlined in the factual background section above. On cross examination, Officer Cole admitted the government did not recover any physical evidence of the crime. App. 104-105.

Mary Castillo, petitioner's wife and the mother of the victim, testified. App. 106-46. She testified about her marriage to petitioner, her daughter's age, their living arrangements, and their work schedules. App. 107-119. She testified that when she worked weekends, petitioner would be at home alone with the victim. App. 119-20. She testified that her daughter was removed from her custody and was living with a foster

family and that she had instructed her daughter to blame another person for touching the victim. App. 120-21. On cross examination, petitioner's counsel established that other men lived at the apartment with them from time to time. App. 138-41.

The victim testified next; her testimony consumes more than 50 pages of the trial transcript. App. 153-216.

Susan Garvin, a social worker, testified after the victim. App. 217-42, 259-63. The relevant portion of her testimony related to her interview of the victim. She testified that the victim told her during the course of two interviews that petitioner sexually abused her, providing details about how the victim claimed petitioner abused the victim. App. 235-42. The State rested its case after Ms. Garvin's testimony.

Petitioner testified and presented other evidence, but none of that evidence materially aided the State's case. The State also presented some rebuttal evidence, but, again, none of it materially contributed to the weight of evidence against petitioner.

Removing the victim's testimony from consideration, therefore, I conclude the State's remaining evidence was not scant, and a reasonable jury could have concluded it was sufficient to establish the elements of the offense. The remaining evidence was not, however, overwhelming. The only evidence of sexual abuse was the hearsay evidence provided by the social worker. If the court erred in permitting the victim to testify by closed-circuit television, then it was not harmless error because the court concludes that the guilty verdict rendered in this case was surely unattributable to the error.

### 3. Is Petitioner's Sixth Amendment Claim Procedurally Defaulted?

Once again, however, that does not end the analysis in this habeas review. At the first trial, petitioner's counsel did not object to the victim testifying by way of closed-circuit television. Rather, petitioner's counsel asked for certain conditions, such as,

requiring the victim be told the nature of the proceedings, that petitioner could see her, and that an interpreter be present to aid petitioner. PCR App. 11-12. At the second trial, petitioner renewed his objections. App. 146-50. On direct appeal, the Iowa Court of Appeals found petitioner had not properly preserved this issue for appeal. Applying a state procedural rule, it refused to consider the issue on direct appeal. *Rosales-Martinez*, 2003 WL 21229134, at *2. As a result, petitioner procedurally defaulted this claim. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (holding that federal courts will not review an issue on habeas review where the petitioner failed to comply with state procedures).

Petitioner, however, asserts that his procedural default must be excused, however, because his trial counsel was constitutionally ineffective. Doc. 45, at 2. To demonstrate that his counsel was ineffective, petitioner must show "both deficient performance by counsel and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Under the *Strickland* standard, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Thus, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. The Iowa Court of Appeals considered petitioner's ineffective assistance of counsel claim, *Rosales-Martinez*, 2003 WL 21229134, at *2, so, on habeas review, this court's task is to determine whether the State

court erred in applying Supreme Court precedent or unreasonably determined the facts when the State court found counsel was not ineffective. 28 U.S.C. § 2254(d). For the reasons set forth above, I find that petitioner cannot show he was prejudiced by counsel's failure to object to the procedure of having the victim testify by closed-circuit television. Because petitioner cannot meet the second prong of the *Strickland* test, he cannot establish that he received ineffective assistance of counsel.

### 4. Summary

For the reasons set forth above, I find that: (1) the court did not err in permitting the victim to testify by closed-circuit television; (2) if it did err, the error was not harmless; but (3) petitioner procedurally default this claimed error and that default was not the result of ineffective assistance of counsel.

### B.    Ground Two— Prosecutorial Misconduct

Petitioner argues he is entitled to relief because of prosecutorial misconduct. Doc. 39, at 12-15. Specifically, petitioner argues that the prosecutor engaged in misconduct when he elicited the testimony from the social worker, Susan Garvin, that she was not surprised by the lack of physical evidence of sexual abuse.

Respondent first argues the court should not consider this argument because petitioner did not include this claim in the petition. Doc.42, at 22. Petitioner argues that it was included in his broadly-worded prosecutorial misconduct claim. Doc. 45, at 2-3. In his Second Amended Petition, petitioner asserted that his trial counsel was ineffective for, among other reasons, failing "to object to prosecutorial misconduct." Doc. 24, at ¶20. In relation to prosecutorial misconduct, petitioner referenced the court's alleged error in denying his motion for a mistrial. Doc. 24, at ¶6. The only motion for a mistrial

in the record related to a claim of prosecutorial misconduct for eliciting testimony from the social worker that she was not surprised by the lack of physical evidence of sexual abuse. App. 262. Accordingly, a liberal reading of the Second Amended Petition could support petitioner's argument that he pled a claim of ineffective assistance of counsel in relation to the allegation of prosecutorial misconduct.

The problem for petitioner, however, is that petitioner never raised an allegation of ineffective assistance of counsel in relation to this claim of prosecutorial misconduct in State court. On direct appeal, petitioner alleged the trial court erred in failing to grant his motion for a mistrial based on the alleged misconduct. *Rosales-Martinez*, 2003 WL 21229134, at *1. He did not allege his attorney was ineffective in some way in relation to this claim. In post-conviction litigation, petitioner alleged his counsel was ineffective for failing to object to alleged prosecutorial misconduct, but only in relation to the elicitation of testimony by Officer Cole, the prosecutor's questioning of the victim's foster mother, the impeachment of petitioner with prior inconsistent statements, and the questioning of petitioner in relation to being present throughout trial. *Rosaeles-Martinez*, 2011 WL 6740152, at *7-9. Indeed, even in the briefing before this court, petitioner does not explain how his attorney was allegedly ineffective in relation to this particular claim of prosecutorial misconduct. Accordingly, I find petitioner has procedurally defaulted any claim that his attorney was ineffective in relation to alleged prosecutorial misconduct arising from the questioning of the social worker.

Nevertheless, the court will address the claim on its merits. Keeping in mind that this case is before the court for habeas review, the question is whether the State court unreasonably applied clearly established federal law as announced by the Supreme Court, or unreasonably determined facts in light of the evidence. 28 U.S.C. § 2254(d). Respondent argues that petitioner failed to identify any Supreme Court precedent he

claims the State court applied unreasonably. Doc. 42, at 23. In his reply brief, petitioner cites Supreme Court precedent setting forth the general standard for prosecutorial misconduct. Doc. 45, at 4. As noted above, however, petitioner makes this claim of error in the context of a claim of ineffective assistance of counsel. The question before this court, therefore, should be whether the State court unreasonably applied federal law regarding ineffective assistance of counsel, or unreasonably found facts from the evidence, when it rejected petitioner's claim that his trial counsel was ineffective in representing him in relation to the alleged prosecutorial misconduct. As noted, however, petitioner never made a claim before the State court that his counsel was ineffective in relation to the alleged prosecutorial misconduct in the questioning of the social worker. As a consequence, there is no State court ruling to review.

Assuming, for the sake of argument, this court should review the State court's ruling on direct appeal on the merits of the prosecutorial misconduct claim itself, I find that the petitioner still fails to carry his burden. Generally speaking, prosecutorial misconduct may result in a denial of a criminal defendant's constitutional right to a fair trial under the Due Process Clause of the Sixth Amendment. *Greer v. Miller*, 483 U.S. 756, 765 (1987) (setting forth standard for prosecutorial misconduct finding). Petitioner has not cited any Supreme Court precedent, however, on the issue of whether the particular questioning at issue constitutes prosecutorial misconduct. Respondent states there is no such precedent (Doc. 42, at 23), and I can find none directly on point. That, alone, is sufficient to rule against petitioner pursuant to Title 28, United States Code, Section 2254(d).

Even if the court addressed the merits of the argument, I would recommend finding against petitioner. First, the district court's order in limine addressed testimony from a medical doctor (or liberally read, any medical doctor), and barred testimony that the

absence of evidence of physical abuse was not dispositive. In fact, such evidence should have been admissible. In *United States v. Kirkie*, 261 F.3d 761, 765-66 (8th Cir. 2001), a doctor testified that the absence of physical evidence of sexual abuse does not mean that it did not occur. The Eighth Circuit Court of Appeals has repeatedly held that district courts have not abused their discretion in admitting such testimony. *Id*. (citing *United States v. Johns*, 15 F.3d 740, 743 (8th Cir. 1994); *United States v. St. Pierre*, 812 F.2d 417, 419 (8th Cir. 1987); *United States v. Azure*, 801 F.2d 336, 340 (8th Cir. 1986)). The State court barred the doctor's testimony, however, because it was not included in the State's minutes of testimony, not because it was inadmissible. The record is unclear to me whether testimony from the social worker suffered a similar deficiency such that it really came within the scope of the court's limine order, but the trial court thought so.

Second, even assuming the State court's limine order applied to the social worker's testimony and was not an abuse of discretion, the judge sustained the objection. Therefore, all the jury heard was that there was no physical evidence of sexual abuse (an undisputed fact and one elicited by petitioner from Officer Cole) and that the social worker was not surprised by that. She was not permitted to testify about why she was not surprised, so the allegedly objectionable testimony never came out. As respondent points out, the witness may have not been surprised by the lack of physical evidence of sexual assault for any number of reasons, some of which may have been innocuous. Doc. 42, at 23. It does not matter, however, because the district court struck the question and that answer and instructed the jury to disregard it. App. 281. Jurors are presumed to follow limiting instructions. *United States v. Gardner*, 396 F.3d 987, 993 (8th Cir. 2005) (holding that courts presume that juries will follow limiting instructions). *See also Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the

presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process."). It was on the basis of these remedial measures that the Iowa Court of Appeals rejected petitioner's claim on direct appeal. *Rosalez-Martinez*, 2003 WL 21229134, at * 1.

Therefore, the testimony was objectionable not because it was unfairly prejudicial to defendant if heard by the jury, but because the State had not complied with state procedures in disclosing anticipated testimony. Nevertheless, the court sustained the objection, struck the testimony, and told the jury to disregard it. Under these facts, petitioner has failed to demonstrate alleged misconduct "so infected the trial with unfairness to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation and citation omitted).

Accordingly, I find petitioner cannot prevail on this claim because: (1) he did not raise this claim in State court, and, therefore, failed to exhaust his state court remedies; (2) he failed to identify any ruling by the State court that was contrary to, or involved an unreasonable application of, federal law; and (3) the admission of the evidence was not erroneous and any error was remedied when the trial judge sustained the objection, struck the testimony, and instructed the jury to disregard it.

### C.     Ground Three—Ineffective Assistance of Counsel

Petitioner argues that his trial counsel was ineffective when he failed to object to testimony from Officer Cole relating petitioner's invocation of his rights to counsel and to remain silent. Doc. 39, at 16-17. Petitioner also objects to the prosecutor's cross examination of him where the prosecutor pointed out that petitioner had the benefit of

hearing other witnesses testify. Doc. 39, at 17-18.[2] Petitioner argues that "either individually or considered cumulatively," these instances of ineffective assistance of counsel warrant relief. Doc. 39, at 16.

Petitioner first raised these claims on direct appeal, but the Iowa Court of Appeals did not address them because it concluded "the record was inadequate" and preserved the issue for "an action for postconviction relief." *Rosales-Martinez*, 2003 WL 21229134, at *4. Petitioner, therefore, raised the issues in his state post-conviction litigation. Trial counsel testified before the district court that he had not objected because he wanted the jury to hear that petitioner had denied the charge from the beginning. PCR App. 386-89, 437-38. Petitioner's trial counsel had used the same strategy in the first trial, which resulted in a hung jury. PSR App. 501. The district court found this explanation to reflect a reasonable trial strategy. *Rosales-Martinez*, 2011 WL 6740152, at *8. Regarding the prosecutor's cross examining petitioner about his ability to be present to hear other testimony before he testified, the district court found that it was permissible cross-examination, relying on *Portuando v. Agard*, 529 U.S. 61, 70 (2000). *Id*. The Iowa Court of Appeals agreed with the district court's reasoning. *Id*.

With regard to Officer Cole's testimony, petitioner cites *Doyle v. Ohio*, 426 U.S. 610 (1976), for the proposition that the prosecutor's examination violated his Sixth Amendment rights. Doc. 39, at 18. I agree that the prosecutor's questions were improper, but that is not the question for this court to decide. Rather, on habeas review, this court's task is to determine if the State court's decision that trial counsel was not

---

[2] Petitioner also alleges his trial counsel was ineffective for stipulating to allowing the victim to testify by closed-circuit television. Doc. 39, at 18. I addressed this claim within the context of petitioner's Sixth Amendment claim, so will not address it here.

ineffective was contrary to, or involved an unreasonable application of, federal law. As the Eighth Circuit Court of Appeals has explained:

> Taken together, AEDPA and *Strickland* establish a "doubly deferential standard" of review. First, under *Strickland*, the state court must make a predictive judgment about the effect of the alleged deficiencies of counsel on the outcome of the trial, focusing on whether it is reasonably likely that the result would have been different absent the errors. The *Strickland* prejudice standard is less demanding than a more-probable-than-not standard, but the difference is slight and matters only in the rarest case. To satisfy *Strickland*, the likelihood of a different result must be substantial, not just conceivable. Under AEDPA, we must then give substantial deference to the state court's predictive judgment. So long as the state court's decision was not "contrary to" clearly established law, the remaining question under the "unreasonable application" clause of § 2254(d) is whether the state court's determination under the *Strickland* standard is unreasonable, not merely whether it is incorrect. This standard was meant to be difficult to meet, and even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.

*Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (quotations and citations omitted).

Therefore, the operative federal law is the *Strickland* standard for determining ineffective assistance of counsel. Petitioner has not explained how the State court's decision was contrary to, or an unreasonable application of, this standard. The State court's factual finding that trial counsel did not object to the testimony as a matter of trial strategy is not an unreasonable conclusion based on the attorney's testimony, so will not be disturbed by this court on habeas review. I find that the State court's conclusion that trial counsel was not unconstitutionally ineffective was not an erroneous decision under the *Strickland* standard. *See McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 107 (3rd Cir. 2012) (holding that trial counsel was not ineffective for failing to object to testimony regarding the criminal defendant's refusal to speak to law enforcement officers

because trial counsel explained that it was a strategic decision designed to show that officers myopically focused their case on the defendant instead of other suspects).

Regarding petitioner's claim that his attorney was ineffective for failing to object to the prosecutor's cross examination of him, petitioner appears to rely on *Doyle*, but the more applicable Supreme Court case is *Portuando*, upon which the State court relied when it denied petitioner's post-conviction appeal. Keeping in mind the nature of this habeas review, this court must determine if the State court's conclusion that trial counsel was not ineffective was contrary to, or involved an unreasonably application of, the *Strickland* standard. The State court found petitioner could not establish an ineffective assistance claim because the cross examination was not, itself, objectionable, relying on the Supreme Court's holding in *Portuando*. The State court's decision was correct. In *Portuando*, the Supreme Court held that testifying defendants are treated the same as all other witnesses. *Portuando*, 529 U.S. at 73.

> A witness's ability to hear prior testimony and to tailor his account accordingly, and the threat that ability presents to the integrity of the trial, are no different when it is the defendant doing the listening. Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate—and indeed, given the inability to sequester the defendant, sometimes essential—to the central function of the trial, which is to discover the truth.

529 U.S. at 73. Therefore, the State court correctly found that trial counsel was not ineffective for failing to object to the prosecutor's cross examination of petitioner.

Petitioner argues he is entitled to relief through the cumulative effect of error, even if individual claims of error do not entitle him to relief. Doc. 39, at 16. Respondent argues that cumulative error analysis is not available, citing *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996). Doc. 42, at 28. Petitioner is correct, however, that this court has previously held that when a petitioner argues that his counsel was ineffective

in several related instances (here, repeated instances of failing to object to testimony about his silence), the court may consider the cumulative effect of the instances together. *Johnson v. United States*, 860 F. Supp. 2d 663, 765 (N.D. Iowa 2012). Here, though, I find trial counsel was not ineffective in any respect, and, therefore, petitioner's cumulative error argument is moot.

Accordingly, I find that the State Court's decision that petitioner was not denied of effective assistance of counsel was not contrary to, or involved an unreasonable application of, federal law.

### D.      Ground Four—Actual Innocence

Petitioner's final argument for habeas relief is that he is actually innocent, relying on his wife's recantation of testimony. Doc. 39, at 19-20. A credible showing of new evidence showing actual innocence may serve as a "gateway" to allow a prisoner to pursue other claims of constitutional error on the merits, "notwithstanding the existence of a procedural bar to relief." *McQuiggin*, 133 S. Ct. at 1931-32. On the other hand, "[t]he Supreme Court has not decided whether a persuasive demonstration of actual innocence after trial would render unconstitutional a conviction and sentence that is otherwise free of constitutional error." *Dansby v. Hobbs*, 766 F.3d 809, 816 (8th Cir. 2014) (citing *House v. Bell*, 547 U.S. 518, 554–55 (2006)). The Supreme Court has made clear, however, "that the threshold for any such claim, if it were recognized, would be 'extraordinarily high' and 'would require "more convincing proof" than the "gateway" standard that allows for consideration of otherwise defaulted constitutional claims upon a showing of actual innocence.'" *Id.*, (quoting *House v. Bell*, 547 U.S. 518, 555 (2006)). The "gateway" standard itself is a "demanding" one, requiring "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial

unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggin*, 133 S. Ct. at 1936 (quoting *Schlup v. Delo*, 513 U.S. 298, 316 (1995)).

As an initial matter, I agree with respondent that petitioner did not assert a claim of actual innocence in State court. Doc. 42, at 28. Therefore, petitioner's actual innocence claim is hobbled by the two-fold problem that (1) there is no clear federal law recognizing actual innocence as a basis for relief, and (2) petitioner cannot point to a State court decision that was contrary to, or involved an unreasonable application of, a clearly established federal law. Petitioner did allege the recantation of testimony by his wife was the basis for a new trial, however, and, therefore, the State court had an opportunity to evaluate the merits of his claim, albeit under a different and lesser standard. *See Rosalez-Martinez*, 2003 WL 21229134, at *4 (noting that a district court has unusually broad discretion in ruling on a motion for a new trial based on newly discovered evidence). The State district court judge heard petitioner's wife testify at a hearing on his motion for a new trial, found her testimony lacked credibility, and found it was contradicted by other evidence. App. 144-45. The record also shows that petitioner's wife had made other, similar prior statements in petitioner's favor that came out in evidence at trial.

I find the witness's recantation would only have contributed marginally to the attack petitioner made at trial regarding her credibility. *See Cox v. Burger*, 398 F.3d 1025, 1031 (8th Cir. 2005) (rejecting an actual innocence claim where the recanted testimony would only further impeach a witness and not establish factual innocence). Furthermore, the State court was correct that the evidence is not "newly discovered." *See Schlup*, 513 U.S. at 324 (requiring the evidence of innocence be newly discovered and "not available at trial through the exercise of due diligence"). Assuming the Supreme

Court would recognize an actual innocence claim as an independent basis for habeas relief, and setting aside petitioner's failure to present this claim in the State courts, I find that petitioner could not meet the extraordinarily high burden that would exist to show his actual innocence.

## VI.    CONCLUSION AND RECOMMENDATION

For the reasons set forth above, I recommend that petitioner's habeas corpus petition be **dismissed with prejudice**.

Objections to this R & R must be filed within fourteen (14) days of the service of a copy of this R & R.  28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b).  Objections must specify the parts of the R & R to which objections are made, as well as the parts of the record forming the basis for the objections.  *See* Fed. R. Civ. P. 72.  Failure to object to the R & R waives the right to *de novo* review by the district court of any portion of the R & R as well as the right to appeal from the finding of fact contained therein.  *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 8th day of July, 2016.

_____
C.J. Williams
United States Magistrate Judge
Northern District of Iowa